**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GEORGE LANE,**

        **Petitioner,**

    **v.**                          **CASE NO. 2:05-cv-1136**
                                          **JUDGE GRAHAM**
**WANZA JACKSON, Warden,**         **MAGISTRATE JUDGE KEMP**

        **Respondent.**


**REPORT AND RECOMMENDATION**

       Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254.  This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.  For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

**I.  FACTS and PROCEDURAL HISTORY**

       The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On March 15, 2002, appellant was indicted on one count of aggravated murder with specifications, one count of tampering with evidence, and one count of having a weapon while under disability. The indictment arose out of an incident in which appellant fatally shot Shanga Lane at an apartment located at 2819 Grosse Point Road in Franklin County, Ohio.
>
> The matter came on for trial beginning May 13, 2003. The count alleging aggravated murder with specifications and the count alleging tampering with evidence were tried to a jury. The count alleging having a weapon under disability was tried to the court.
>
> At trial, the state presented evidence showing the following facts: Sheyoshi Lane is appellant's cousin. On Tuesday, March 5, 2002,

sometime between 12 and 2 p.m., Sheyoshi drove her brother, Shanga, and her son, Gavin, to an apartment where her cousin, Jontyia Wilder (Tyia) resided. Tyia was throwing a birthday party for her daughter, Ebony Wilder, that evening.

Appellant, who was Shanga's cousin, was staying at Tyia's apartment. Shanga wanted to be dropped off early at Tyia's so that he could visit with appellant before the party began.

Sheyoshi returned to Tyia's apartment later that evening to pick up Shanga and her son. When Sheyoshi arrived at Tyia's apartment, the party was going on. Sheyoshi observed that appellant was bleeding from his lip and that he was angry. Sheyoshi saw appellant leave the apartment through the sliding back door that exits from the kitchen to a patio. A couple of minutes later, Sheyoshi saw appellant re-enter the apartment through the same door.

Jonathan Wilder is Ebony's older brother. Shanicqua Wilder is Jonathan's girlfriend. Sheyoshi, Shanga, Jonathan, and Shanicqua were all in the kitchen when appellant re-entered. Appellant was still angry and yelled: "One of you mother fuckers is going to pay." (Tr. 70.) Appellant then went upstairs. Sheyoshi, Shanga, and Gavin began walking toward the front door to leave. Because there was some talking and laughing still going on, Sheyoshi decided to sit on the bottom steps of the stairway leading to the upstairs. The steps where Sheyoshi sat were located to the immediate left of the front door of the apartment. As Sheyoshi was sitting on the bottom steps, she observed appellant run down the stairway holding a gun. While standing on the stairway, appellant pointed the gun over the stairway rail at Shanga and fired the gun several times. Appellant then ran out the front door followed by his girlfriend.

Sheyoshi testified that about five to ten minutes elapsed between the time appellant went upstairs until the time he shot Shanga. Prior to the shooting, Sheyoshi heard appellant say, "Fuck that," and "You all not going to be playing with me like that." (Tr. 85.)

After appellant ran out the front door, Sheyoshi called 911 on her cell phone. Sheyoshi heard Tyia say, "Shanga's dead, Shanga's dead." (Tr. 86.) Sheyoshi touched Shanga as he lay on the kitchen floor. Sheyoshi became upset and started throwing bottles around the apartment and "tearing the house up." (Tr. 88.)
Tyia Wilder testified that on March 4, 2002, appellant and his girlfriend, Latrina Morgan, stayed over at Tyia's apartment. Tyia let

2

appellant and his girlfriend sleep upstairs in her children's room since they were not home that night. Appellant kept his belongings in the upstairs bedroom. Tyia was aware that appellant kept a gun amongst his belongings. In the early hours of March 5, 2002, Tyia's ex-boyfriend, Anthony Palmer, unexpectedly showed up at Tyia's apartment yelling and banging at the door. Tyia called the police. The police came and took a report. Appellant was there at Tyia's apartment when this incident regarding Anthony occurred. Tyia had had similar problems with Anthony before and had called the police. Tyia testified that she did not ask appellant to come to her aid in any way and that she felt that calling the police was the best way to handle Anthony. Tyia testified on cross-examination that appellant did not give her his gun during this incident with Anthony.

Tyia testified that on the evening of March 5, 2002, she left the party at her apartment to go to the "drive-through." When she returned to the party, appellant's lip was bleeding and "Shanga was trying to apologize." (Tr. 120.) Appellant went out through the rear door to the patio and Tyia followed to try to calm appellant down. According to Tyia, while appellant was on the patio, appellant stated: "Somebody is going to die," and "Somebody is going to pay for this," and "somebody is going to pay for this hospital bill." (Tr. 122.)

Tyia was outside on the patio with appellant for about two or three minutes. She then went back inside to go upstairs to her bathroom. While Tyia was going upstairs, she saw appellant re-entering through the back door into the kitchen area. Appellant then came upstairs while Tyia was in the upstairs bathroom. Appellant entered the bathroom to look at his lip. Tyia tried to calm appellant down while appellant was saying: "Somebody is going to have to pay for this." (Tr. 124.)

While Tyia remained upstairs, appellant then went downstairs. Tyia heard appellant say, "MFing body want to step outside?" Id. She also heard appellant say he is going to "blow their head off," and then she heard gunshots. *Id.*

Ebony Wilder was 18 years old on the date that appellant shot Shanga Lane. Ebony arrived at Tyia's apartment for her birthday party around 6 p.m. Ebony observed appellant and Shanga engaging in play-boxing in the living room and then in the kitchen. Appellant and Shanga were not angry during the play-boxing. During the play-boxing, Shanga hit appellant on the lip, and then appellant became angry. Ebony heard appellant say: "Someone is going to pay for my

doctor bill. As soon as he steps out this door, I am going to shoot him in the head." (Tr. 177.)

Ebony observed Shanga apologize several times. Ebony tried to calm appellant down. She observed appellant leave the apartment through the back door and observed appellant re-enter the apartment after Tyia re-entered. After appellant reentered the apartment, she observed that he was still "in a rage." (Tr. 178.) Appellant stated that someone was going to pay for his doctor bills and he was going to shoot Shanga. Ebony observed appellant go upstairs while she was in the living room. After appellant was upstairs for about five minutes, Ebony saw appellant coming downstairs. While on the stairs, appellant looked over the banister, pointed a gun at Shanga, and fired it. According to Ebony, "Shanga turned around, grabbed his neck, and he kind of stumbled to the kitchen and hit the floor." (Tr. 180.)

Timothy Dorn is a detective of the Columbus Division of Police assigned to the Crime Scene Search Unit. Detective Dorn arrived at the crime scene at 2819 Grosse Point Road between 1 and 1:15 a.m. on March 6, 2002. The crime scene had already been secured by other police officers by the time Detective Dorn arrived. Detective Dorn took photographs of the crime scene and the victim. He collected four .22 caliber shell casings. Detective Dorn opined that the shell casings were ejected from a semiautomatic pistol and that shell casings are usually ejected to the right, or to the rear of the direction the gun is pointed. Detective Dorn marked the location in the apartment where each spent shell casing was found and took photographs of the marked locations. All four of the shell casings were found in the living room of the apartment.

Detective Dorn found evidence of two bullet strikes in the living room wall. One of the bullet strikes was located near the entrance to the kitchen. Although he dug into the wall, he was unable to recover a bullet.

Dorothy Dean, M.D., is a forensic pathologist employed as a deputy coroner by the Franklin County Coroner's Office. On March 6, 2002, Dr. Dean performed an autopsy on the body of Shanga Lane. She found two bullet wound injuries. There was a nonfatal neck wound caused by a bullet moving from the front to the back of the neck. The shot was slightly to the right and downwards on the neck. The bullet perforated the soft tissue of the neck and exited the body at the rear of the neck. The fatal shot entered the left side of the victim's skull just inside the hairline. It traveled up through the brain where it

4

rested. Dr. Dean removed the bullet fragment.

Dr. Dean examined the victim's hands and found no bruises, abrasions, or lacerations. Dr. Dean's opinion as to the cause of death was that Shanga Lane died of a gunshot wound to the head with perforation of the skull and brain.

Dr. Dean also analyzed the victim's blood for alcohol, which was found to be at .30, indicating a high level of alcohol intoxication at the time of death. The victim also had marijuana in his system.

Dr. Dean opined that the bullet path for the nonfatal neck wound is consistent with the shooter being elevated with respect to the victim. The fatal head wound is consistent with the victim turning his head and having his head slightly down.

Dr. Dean found no evidence of stippling on either wound. Stippling occurs when the weapon being fired is in close proximity to the victim's skin. Stippling involves small abrasions to the victim's skin caused by the hot gas and unburned gun powder from the fired weapon.

The defense called four witnesses to testify at trial: (1) Detective Robert Viduya of the Columbus Police Department, (2) Donna Obadina, appellant's aunt, (3) Karen Lane, appellant's mother, and (4) appellant.

After his arrest at his mother's residence located in Columbus, Ohio, appellant was brought to Detective Viduya for questioning sometime between 9 and 9:30 a.m. on March 6, 2002, approximately nine hours after the shooting of Shanga Lane. After being advised of his constitutional rights, appellant agreed to be interviewed by Detective Viduya. The interview was videotaped.

Appellant informed Detective Viduya that as he was leaving the scene of the shooting, he fell in a grassy area away from the scene. He removed a magazine from the .22 caliber pistol that was used in the shooting and threw the pistol in a sewer grate. He threw the magazine in a grassy area. Detective Viduya and his partner went out to search all of the sewer grates in the area that appellant described but were unable to find the pistol.

Appellant stated to Detective Viduya that he had been drinking and he was "high" at the time of the shooting. (Tr. 241.) Appellant admitted to Detective Viduya that he had been drinking hard liquor and smoking marijuana during the birthday party.

After Detective Viduya refreshed his recollection by reviewing the videotape of his interview of appellant, he testified that appellant complained that his ribs were hurting and that he had some back injuries. Appellant also told Detective Viduya that his face was injured but Detective Viduya testified that "the injuries had gone away by the time we interviewed him." (Tr. 355.) Under cross-examination, Detective Viduya testified that appellant never pulled up the "black hoody" that he was wearing to show any bruising on his ribs. (Tr. 356.) Detective Viduya also testified on cross-examination that appellant's eye did not appear to be swollen and he did not notice any abrasions or contusions to the face other than the "split lip." (Tr. 356.)

Donna Obadina, appellant's aunt, lives in a house located about a five-minute walk from Tyia's apartment where the shooting occurred. Donna testified that in the early morning hours of March 6, 2002, she was awakened by a banging on her door. Donna lives with her daughter and grandson. She let appellant and appellant's girlfriend, Latrina Morgan, into her house. Donna testified that appellant "collapsed in my arms" and that he was "gasping for a breath" and "spitting up blood." (Tr. 252.) She testified that she first laid appellant down in her front room and then took him to her bedroom and laid him down there. She removed appellant's white t-shirt. "There was a lot of blood at the bottom of the shirt and blood coming down the center." (Tr. 254.)

Donna testified that she administered first aid to appellant and she cleaned his mouth out. She wanted to take appellant to the emergency room but he did not want to go. She applied ice wrapped in towels to appellant's ribs because appellant was complaining that his ribs ached. Donna testified that she observed bruises around appellant's ribcage. Donna crushed an aspirin so that appellant could swallow it for the pain. Appellant told Donna that he had been in a "terrible fight." (Tr. 256.) Donna phoned appellant's mother, who asked that Donna bring appellant to her house. Donna gave appellant something "like a shirt" to wear and then drove appellant to his mother's house.

Donna observed that appellant appeared intoxicated during the time that she was administering first aid to appellant. Donna was unaware at that time that Shanga Lane had been shot.

Karen Lane, appellant's mother, testified that after her sister pulled up to her house, she came outside to help appellant walk into her house.

6

Karen took one side of appellant and Latrina Morgan took the other. Appellant was complaining that his ribs were hurting. Karen testified that appellant's "whole t-shirt was covered with blood." (Tr. 293.) Appellant was helped to his room and then he "started throwing up chunks of blood." *Id.* "He was scared, he was in shock and he was crying." (Tr. 294.) Karen and Latrina had to cut appellant's shirt in order to remove it. Appellant told his mother that he had gotten into a fight. According to Karen, she observed that the lower lid of appellant's eye "was kinda hanging" and "his lip was busted." (Tr. 294-295.)

Appellant and his girlfriend were then left to stay in appellant's room. When Karen awoke that morning, she saw her son's picture on television and heard that he was wanted for shooting his cousin. Karen then went to her son's room and told him that she was going to call the police so that he could turn himself in. Appellant "started crying and saying he didn't mean to do it." (Tr. 298.) After Karen made the call, the police came out to her house to arrest appellant.

Appellant testified on his own behalf at trial. Appellant's testimony began with his recounting of an incident regarding Tyia's ex-boyfriend, whom appellant knew as "Tone." While appellant and his girlfriend were staying at Tyia's, Tone unexpectedly arrived at Tyia's apartment early in the morning of March 5, 2002. According to appellant, Tyia let Tone come inside her apartment. Tone was "in a fit of rage," asking where "the keys were to the car." (Tr. 312-313.) Tone momentarily left the apartment and then returned. During this time, appellant gave Tyia his gun. Tyia then went outside with Tone where they argued. According to appellant, after Tone left, appellant persuaded Tyia to call the police.

Appellant testified that later that day, Shanga came over to Tyia's apartment to see appellant. Shanga's sister, Sheyoshi, dropped Shanga off. Before the birthday party started, Shanga and appellant drank beer and were "having a good ole time smoking weed." (Tr. 316.) At one point, appellant, Shanga, Tyia, Ebony and Ebony's boyfriend made a trip to a liquor store to purchase liquor. They returned to Tyia's apartment around 7 p.m. Thereafter, appellant made another trip with Tyia to see appellant's friend about some money. During this trip, Tyia gave the gun back to appellant and appellant put the gun in his back pocket. They again returned to Tyia's apartment where the party was going on.

According to appellant, he then got into an argument with Sheyoshi

7

about the incident with Tone. Sheyoshi blamed appellant for failing to stop Tone from going through Tyia's apartment. Appellant told Sheyoshi: "I didn't need to be in that with Tyia." (Tr. 318.)
According to appellant, Sheyoshi started cursing and pointing her finger at appellant. Appellant cursed her back. According to appellant, Shanga then moved his sister out of the way and struck appellant on the lip. On his way out the back door, appellant was hit in the back of the head by his other cousin, Jonathan Wilder. Appellant denies that he and Shanga were play-boxing as the state's witnesses have testified.

According to appellant, while he was outside at the rear patio, Tyia came outside to ask if he was all right. Appellant started yelling: "I had to go to the hospital. Who is going to pay my doctor bill?" (Tr. 322.) Tyia asked appellant to come back into the apartment and she would clean him up. Appellant decided to go back inside to get his girlfriend because he "was afraid for her safety." (Tr. 323.) Appellant was outside with Tyia "a couple of minutes." *Id.*

When appellant re-entered the kitchen through the rear door, Sheyoshi began "cussing" at appellant again. (Tr. 324.) Sheyoshi called appellant a "bitch" and appellant then called her a "bitch." (Tr. 324-325.) After Sheyoshi hit appellant, he tried to go out the back door again, but his exit was blocked by Jonathan Wilder. Then Shanga struck appellant, causing him to fall to the ground. While appellant was on the living room floor, he was stomped on and kicked by Jonathan, Ebony, Tyia, Shanga, and Sheyoshi. Appellant was kicked in his sides and in his face. According to appellant, he then pulled the gun out of his right back pocket while he was "curled up in a ball." (Tr. 326.) "As soon as I did that, I felt someone grab my wrist. As I fell, someone grabbed my wrist, I just shot." *Id*. Appellant admits firing the gun three times.

According to appellant, the kicking stopped after the gun went off. Appellant remembers getting up and, as he was leaving through the front door, he saw Shanga fall.

Appellant admitted on the stand that he threw the gun "down the sewer" after he ran from Tyia's house. (Tr. 329.) Appellant's girlfriend called him by cell phone. Appellant then met his girlfriend in front of his aunt's house.

The jury returned guilty verdicts for aggravated murder with specifications and for tampering with evidence. The court found

8

appellant guilty of having a weapon under disability. The court held
a sentencing hearing on May 29, 2003, and filed its judgment entry
on June 3, 2003.

Exhibit 6 to Return of Writ. Petitioner was sentenced to an aggregate term of twenty years to life

plus three years for use of a firearm. Exhibit 3 to Return of Writ. Represented by new counsel,

petitioner filed a timely appeal. He asserted the following assignments of error:

> I. THE JURY'S VERDICT OF AGGRAVATED MURDER WAS
> AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT ERRED WHEN IT ENTERED
> JUDGMENT AGAINST THE APPELLANT WHEN THE
> EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION
> OF AGGRAVATED MURDER.

*See* Exhibit 6 to Return of Writ; Exhibit 4 to Return of Writ. On November 4, 2004, the state

appellate court affirmed the trial court's judgment. Exhibit 6 to Return of Writ. Petitioner never

filed a timely appeal of the appellate court's decision to the Ohio Supreme Court; however, on

September 14, 2005, he filed a motion for delayed appeal pursuant to Ohio Supreme Court Rule of

Practice II, Section 2(A)(4)(a). Exhibit 7 to Return of Writ. On October 26, 2005, the Ohio

Supreme Court denied petitioner's motion for delayed appeal and dismissed the appeal. Exhibit 9

to Return of Writ.

On December 20, 2005, petitioner filed the instant *pro se* petition for a writ of habeas corpus

pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of

the Constitution of the United States based upon the following grounds:

> 1. Insufficient... evidence[.]
>
> Defendant should have been acquitted or... convicted of the lesser
> included offense of negligent homicide. Evidence presented at trial
> did not support the conviction of aggravated murder.

9

2. Manifest weight of the evidence.

The jury lost its way and the weight of the evidence should have acquitted defendant.

It is the position of the respondent that claim one is procedurally defaulted and that claim two is inappropriate for federal habeas corpus review.

## II. CLAIM ONE: PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration.  28 U.S.C. §2254(b), (c).  If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies.  *Id.; Anderson v. Harless*, 459 U.S. 4, 6 (1982) *(per curiam)*; *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).  If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error.  *Murray v. Carrier*, 447 U.S. 478, 485 (1986); *Engle v. Issac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule.  *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).  "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule."  *Id.*  Second, the Court must determine whether the state courts actually enforced the state procedural sanction.  *Id.*  Third, it must be decided whether the state procedural

forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In claim one, petitioner asserts that the evidence was constitutionally insufficient to sustain his conviction on aggravated murder. This claim was properly raised on direct appeal; however, petitioner failed to file a timely appeal of the appellate court's decision, and the Ohio Supreme Court summarily denied his motion for delayed appeal. The United States Court of Appeals for the Sixth Circuit has held that the Ohio Supreme Court's denial of a motion for delayed appeal under such circumstances constitutes an adequate and independent state ground to preclude federal habeas corpus review. *Bonilla v. Hurley,* 370 F.3d 494, 497 (6th Cir. 2004):

> This case turns upon whether the Ohio Supreme Court entry denying Bonilla's motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of Bonilla's habeas corpus petition. Upon examination of the Ohio Supreme Court Rules, we conclude that it does. The Ohio Supreme Court Rules require a motion for a delayed appeal to state "the date of entry of the judgment being appealed and adequate reasons for the delay." Ohio Sup.Ct. R. II, Section 2(A)(4)(a). In addition, the motion must be accompanied by a supporting affidavit and a "copy of the decision being appealed." *Id.* A motion for a delayed appeal is not required to contain the actual claims and supporting arguments sought to be presented on appeal. *Id.* Instead, only when "the Supreme Court grants a motion for delayed appeal," is the appellant required to "file a memorandum in support of jurisdiction." Ohio Sup.Ct. R. II, Section 2(A)(4)(c). Thus, the applicable Ohio court rules indicate that the denial of a motion for a delayed appeal is a procedural ruling, not

11

a ruling on the merits....

> We therefore conclude that Bonilla's grounds for relief have been procedurally defaulted. *See Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir.2000). Bonilla failed to file a timely notice of appeal with the Ohio Supreme Court and his motion for leave to file a delayed appeal was denied by that court apparently because he failed to demonstrate adequate reasons for his failure to file a timely notice of appeal or to otherwise comply with the provisions of Ohio Sup.Ct. R. II, Section 2(A)(4). Where a state court is entirely silent as to its reasons for denying requested relief, we assume that the state court would have enforced any applicable procedural bar. *Simpson v. Sparkman,* 94 F.3d 199, 203 (6th Cir.1996).

*Id.* This Court therefore likewise concludes that petitioner has procedurally defaulted his claim of insufficiency of the evidence.

Petitioner can still secure review of this claim on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges.  As cause for his procedural default of claim one, petitioner asserts the ineffective assistance of counsel.  The ineffective assistance of counsel may constitute cause for a procedural default, so long as such claim has been presented to the state courts and is not itself procedurally defaulted.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).  Petitioner states that appellate counsel failed to advise him that he needed to file an appeal to the Ohio Supreme Court before seeking habeas corpus relief, or of the 45-day time limit for filing a timely appeal.  Petitioner states that he was unable to file a timely appeal to the Ohio Supreme Court because he was transferred from the Ross Correctional Institution to the Lebanon Correctional Institution on February 11, 2004, and although he advised his attorney of his new address, counsel sent notice of the appellate court's decision denying his appeal to the Ross Correctional Institution.

> Around December of 2004, my attorney contacted my mother, Karen Lane, telling her that he had sent the [appellate] court's opinion to me

12

> at R.C.I., and [it] was returned to him.  At this time he sent her by
> mail the [appellate] court's opinion.
>
> My mother... sent me the [appellate] court's opinion around the end
> of December 2004.
>
> At this time my 45 days for appealing to the Ohio Supreme Court had
> expired.

*Affidavit of Petitioner, see Traverse.*  Petitioner states that he did not file his motion for delayed

appeal with the Ohio Supreme Court until approximately nine months later, in September 2005,

because he was transferred from the Lebanon Correctional Institution to the Warren Correctional

Institution, and was unable earlier to obtain legal assistance from another inmate.  *Id.*

Petitioner has submitted an affidavit from his mother, Karen Lane.  Lane states that, on

February 28, 2005,  she learned that petitioner's appeal had been denied from the Franklin County

Clerk of Court.  *Affidavit of Karen Lane, see Traverse.*  On March 8, 2005, she met with petitioner's

attorney and told him that petitioner did not know that the state appellate court had denied his

appeal. *Id.*  Appellate counsel said he had mailed a copy of the appellate court's decision denying

petitioner's appeal to the Ross Correctional Institution.  He had assumed petitioner had received a

copy of the appellate court's decision, since it had not been returned as undeliverable.  *Id.*  On

March 14, 2005, Lane forwarded a copy of the appellate court's decision to petitioner.  *Id.*

Petitioner has failed to establish cause for the delay in filing his motion for delayed appeal

for months after he received notice of the state appellate court's decision denying his appeal.

"[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default."

*Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001), citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th

Cir. 1999)(internal citation omitted).

" '[C]ause' under the cause and prejudice test must be something

> external to the petitioner, something that cannot fairly be attributed to him [;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule."
> *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (emphasis in original).

*Maples v. Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).  Petitioner may, for example, establish cause where he gives papers to prison authorities five days prior to the filing deadline, but prison authorities fail to promptly deliver the papers, and the filing is denied by the state court as one day late.  *Id.,* at 438-439. Petitioner's *pro se* status, his "ignorance of the law and procedural requirements for filing a timely notice of appeal is insufficient to establish cause to excuse his procedural default."  *Bonilla v. Hurley,* supra, 370 F.3d at 498, citing *Hannah v. Conley*, 49 F.3d 1193, 1197 (6th Cir.1995).

Further, while ineffective assistance of counsel may constitute cause for a procedural default, *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000), citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986), the ineffective assistance of counsel cannot constitute cause for failing to file a timely notice of appeal with the Ohio Supreme Court where petitioner had no right to counsel in those proceedings.  *See Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 425 (6th Cir. 2003), citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)("[T]he right to counsel extends to the first appeal of right, and no further.")

In *Smith v. Ohio Department of Rehabilitation and Correction*, 331 F.Supp.2d 605, 618 (N.D. Ohio 2004), the United States District Court for the Northern District of Ohio rejected petitioner's assertion that counsel's failure to give him timely notification of the appellate court's decision rejecting his claims constituted cause for his procedural default in failing to file a timely appeal to the Ohio Supreme Court:

14

[A]ttorney error cannot constitute cause where the error caused a petitioner to default in a proceeding in which the petitioner was not constitutionally entitled to counsel. *Coleman [v. Thompson],* 501 U.S. [722] at 751-53, 111 S.Ct. 2546. In *Coleman*, the United States Supreme Court concluded that an attorney error which led to the late filing of a state habeas appeal cannot be constitutionally ineffective because individuals are not entitled to counsel in state post-conviction proceedings. *Id*. at 752-53, 111 S.Ct. 2546.

As in post-conviction proceedings, [petitioner] had no constitutional right to counsel on his discretionary appeal to the Ohio Supreme Court. *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (defendant is entitled to effective assistance of counsel only on his first appeal of right); *see also Ross v. Moffitt*, 417 U.S. 600, 609-10, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). Because [petitioner] has no constitutional right to counsel on his discretionary appeal to the Ohio Supreme Court, an attorney error, such as arguably committed by Mr. Smith's appellate attorney, cannot be constitutionally ineffective so as to excuse the procedural default. [FN13] *See Barkley v. Konteh*, 240 F.Supp.2d 708, 713-14 (N.D.Ohio 2002) (concluding that attorney's failure to notify a defendant of a Ohio Court of Appeals' decision, thereby preventing him from filing a timely appeal, cannot amount to constitutionally ineffective assistance of counsel); but *cf. Paris v. Turner*, 187 F.3d 637, 1999 WL 357815 at *2-3 (6th Cir.1999) (unpublished) (concluding that attorney's failure to notify a defendant of a Ohio Court of Appeals' decision, thereby preventing from filing a timely Rule 26(B) application, constitutes constitutionally ineffective counsel serving as cause to excuse the procedural default).Because petitioner had no right to counsel on appeal to the Ohio Supreme Court, the ineffective assistance of counsel cannot constitute cause for his procedural default in failing to file a timely appeal.

*Id.; see also Shabazz v. Ohio*, 149 F.3d 1184, unpublished, 1998 WL 384559 (6th Cir. June 18, 1998).  Petitioner likewise has failed to establish cause for his procedural default of claim one.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333s.  After review of the record, the Court does not deem this to be such a case.

15

### III.  CLAIM TWO

In claim two, petitioner asserts that his conviction on aggravated murder was against the manifest weight of the evidence.  As noted by the respondent, this claim is not appropriate for federal habeas corpus review.[1]  The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without proof sufficient to allow a rational trier of fact to find guilt beyond a reasonable doubt.  *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.), *cert. denied*, 464 U.S. 962 (1983).  In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence and the credibility of the witnesses.  *Jackson*, 443 U.S. at 319; *Walker*, 703 F.2d at 969.

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence – as opposed to one based upon insufficient evidence – requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Martin*, 20 Ohio App.3d 172, 175 (1983); *cf. Tibbs v. Florida*, 457 U.S. 31 (1982).  Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct

---

[1]  For the reasons discussed, *supra*, claim two appears to be procedurally defaulted; however, respondent has not raised this issue of procedural default, which is an affirmative defense.  *Trest v. Cain,* 522 U.S. 87, 89 (1997); *Gray v. Netherland*, 518 U.S. 152, 166 (1996).

such an exhaustive review, petitioner's claim that his conviction was against the manifest weight of the evidence cannot be considered by this Court.

**IV.**

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED**.

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation* de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

```
                              /s/ Terence P. Kemp
                              United States Magistrate Judge
```

18